**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ELEVELE LLC and ANDREW HUNT, | |
| Plaintiffs, | |
| v. | Case No. _____ |
| HARVEST ENTERPRISES, INC., | |
| Defendant. | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

The Plaintiffs, Elevele LLC and Andrew Hunt, state as follows for their Complaint against Harvest Enterprises, Inc.

**NATURE OF THE ACTION**

1.   This action concerns the sale of equity interests in a licensed medical cannabis dispensary. On March 25, 2019, Elevele LLC and its Members entered into a Membership Interest Purchase Agreement with Harvest Enterprises, Inc.  As a result of the breach of such Agreement by Harvest, the ability to close the transaction is far from certain as Harvest and its affiliates purport to have acquired rights to purchase more dispensary licenses than the five Illinois law allows. Indeed, Harvest has run into this exact same regulatory problem in States other than Illinois. Despite Elevele's repeated requests, Harvest has provided Elevele with no plan for how it intends to relinquish any of the excess licenses it has acquired and thus enable the transaction to close.

1

2. Without a clear path to closing, Elevele exercised its contractual right to terminate the Membership Interest Purchase Agreement. Harvest has disputed Elevele's exercise of this termination right and has threatened to seek the remedy of specific performance, ostensibly to force Elevele to close on an equity sale transaction at some indefinite point in the future. And this closing itself would be contingent on Harvest taking certain steps to comply with Illinois law, which to date it has failed to do.

3. Elevele, and its Members Representative, Andrew Hunt, seek entry of a judgment declaring that they properly exercised their termination right under the Membership Interest Purchase Agreement, as well as an award of attorneys' fees against Harvest as permitted by contract.

### PARTIES, JURISDICTION, AND VENUE

4. Plaintiff, Elevele LLC ("Elevele"), is an Illinois limited liability company with its principal place of business in Lake County, Illinois.

5. Plaintiff, Andrew Hunt ("Hunt"), is an Illinois citizen residing in Lake Forest, Illinois and a Member of Elevele.

6. The Defendant, Harvest Enterprises, Inc. ("Harvest"), is a Delaware corporation with its principal place of business in Tempe, Arizona.

7. Harvest is subject to personal jurisdiction in the State of Illinois because it has entered into a contract, the Membership Interest Purchase Agreement dated March 25, 2019 (the "Purchase Agreement"), substantially connected with this State. 735 ILL. COMP. STAT. § 5/2-209(a)(7). The Purchase Agreement relates to the purchase of equity in a medical cannabis dispensary located in Illinois. This declaratory judgment action

2

relates entirely to the parties' rights, duties, and obligations under the Purchase Agreement.

8.  Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Plaintiffs' claims occurred in the Northern District of Illinois.

9.  Venue also is proper because the parties agreed in Section 8.02 of the Purchase Agreement that "any legal or equitable action or proceedings arising under or in connection with this Agreement may be brought in the state or federal courts of the United States with jurisdiction in either Maricopa County, Arizona or Cook County, Illinois." (**Ex. A**, § 8.02 at p. 50).

10. The Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Elevele is an Illinois limited liability company with three Members, each of whom is a citizen of the State of Illinois. Harvest is a corporation organized under the laws of the State of Delaware, having its principal place of business in the State of Arizona. The parties are thus completely diverse.

11. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs, because the purchase price for Elevele's equity under the Purchase Agreement is greater than the jurisdictional minimum amount.

## STATEMENT OF FACTS

12. In August 2013, then-Governor Pat Quinn signed into law the Compassionate Use of Medical Cannabis Pilot Program Act. *See* 410 ILL. COMP. STAT. § 130/1 *et seq.* (the "Medical Cannabis Act").

13. Effective January 1, 2014, Illinois became the 19th State to remove state-level criminal penalties for the medical use, cultivation, and sale of cannabis.

14. The Medical Cannabis Act enabled various State agencies, including the Department of Financial and Professional Regulation (or, "IDFPR"), to adopt rules establishing the procedures for dispensing organization applicants.

15. Those Administrative Rules are codified in Part 1290 of the Illinois Administrative Code, entitled "Rules for Administration of the Compassionate Use of Medical Cannabis Pilot Program."

16. Before it issues licenses that enable dispensing organizations (often called "dispensaries") to operate, the IDFPR reviews applications.

17. The process that the IDFPR must follow is set forth in Illinois Administrative Code Section 1290.40.

18. One regulation, common among States that allow medical cannabis use, pertains to the maximum number of licenses a party may hold.

19. Under sub-section 1290.40(a)(14), "[n]o person or entity shall have a financial interest in more than five registrations or hold itself out as an owner of more than five registrations." Nor, under that same rule, shall any person be a principal officer in more than five registered dispensaries.

20. While the recent legislation signed in June 2019, in which *recreational* use and purchase of cannabis will be legal, will increase the cap on the number of dispensaries that an organization may hold to 10, each existing license, including Elevele, has certain

rights to obtain a second license, thereby doubling the number of licenses Harvest purports to have the right to acquire and further exacerbating the issue.

21. Elevele is a licensed and approved cannabis dispensary based in Highland Park, Illinois.

22. Elevele first began business in March 2016, and it serves patients throughout the Lake County area.

23. Harvest is a Tempe-based vertically integrated cannabis company, which is publicly traded on the Canadian Stock Exchange.

24. As of March 2019, Harvest operated 13 retail cannabis locations in five States and expected "[s]ignificant expansion of cultivation, manufacturing, and retail locations" throughout 2019.

25. In the first quarter of 2019, Harvest announced pending acquisitions in various geographic locations in the United States. One of these pending acquisitions was for Verano Holdings, a Chicago-based cannabis company, under which Harvest expected to add dispensary licenses in both the Midwest and East Coast.

26. On March 25, 2019, around the time Harvest's aggressive expansion plans became public, Elevele and its Members entered into the Purchase Agreement with Harvest. (**Ex. A**).

27. Under Section 4.02(b) of the Purchase Agreement, Harvest represented and warranted as follows:

> The execution, delivery and performance by [Harvest] of this Agreement and the Ancillary Agreements to which each is a party and the consummation of the transactions

> contemplated hereby and thereby do not and will not …(b)
> conflict with or result in a violation or breach of any Law or
> Governmental Order applicable to [Harvest];…

(**Ex. A**, § 4.02 at p. 34). In relevant part, the defined term "Law" means "any domestic or

foreign, federal, state, municipality or local law, statute, ordinance, code, rule,

regulation, directive, norm, order, requirement or rule of law (including common law)."

(**Ex. A**, § 1.01(dd) at p. 4).

28. Section 5.02 of the Purchase Agreement provides that Elevele and Hunt only

were obligated to complete the closing of the transaction if several conditions were met.

29. One of those conditions to closing provides that "[e]ach of the representations

and warranties made by [Harvest] in this Agreement shall have been true and correct

when made and shall be true and correct in all material respects as of the Closing Date."

(**Ex. A**, § 5.02(a) at p. 35).

30. The Purchase Agreement contains a "Termination" provision in Section 5.03,

which provides in relevant part that

> This Agreement may be terminated at any time prior to the
> Closing as follows:
>
> …
>
> (c) by the Members' Representative, by written notice to
> [Harvest] if…(ii) any of the conditions set forth in <u>Section
> 5.02</u> shall not have been, or if it becomes apparent that any of
> such conditions will not be, fulfilled by the Termination
> Date…

(**Ex. A**, § 5.03(c) at p. 36).

31. The "Termination Date" is further defined in the Purchase Agreement as "90 days from the Effective Date." (**Ex. A**, § 1.01(uu) at p. 7).

32. Based on the Effective Date of March 25, 2019, the Termination Date thus became June 23, 2019.

33. Between the signing of the Purchase Agreement and June 23, 2019, Harvest repeatedly acknowledged to Elevele that it and its affiliates had the contractual right to acquire more than five dispensary licenses in the State of Illinois, but that Harvest had certain contractual rights to divest of dispensary licenses so that they would be in compliance with sub-section 1290.40(a)(14).

34. Upon information and belief, at least some of those dispensary license rights stem from Harvest's contract to acquire Verano.

35. Upon further information and belief, Verano holds, retains an ownership stake in or has a contractual right to acquire dispensaries located in Norwood Park, St. Charles, and Effingham, and Harvest has publicly announced its intention to close the Verano transaction in 2019.

36. Upon further information and belief, Harvest's CEO, Steve White, has an ownership stake in at least one dispensary located in Illinois.

37. Upon further information and belief, Harvest has filed applications with the IDFPR to transfer licenses for Elevele and at least one other licensed dispensary.

38. As a result, Harvest's and its affiliates acquisition of rights to more than five dispensary licenses thus conflicted with the requirement of Section 1290.40(a)(14) of the

Illinois Administrative Code, which bars Harvest from holding more than five dispensary registration licenses.

39. Harvest, too, is foreclosed from unilaterally transferring or assigning a dispensary registration, a rule articulated in Section 1290.130 of the Illinois Administrative Code.

40. Between the signing of the Purchase Agreement and June 23, 2019, Harvest did not take adequate or reasonable steps with the IDFPR to ensure that the consummation of the Purchase Agreement would comply with all applicable legal requirements and occur as promptly as practicable—and specifically address the surplus of licenses and the requirement that capped the number of dispensary registrations Harvest could own in the State of Illinois.

41. Put simply, Harvest has embarked on an aggressive acquisition strategy to purchase license rights from dispensary owners without apparent regard that its strategy creates an obstacle to closing the Purchase Agreement with Elevele.

42. Harvest thus breached its representation and warranty contained in Section 4.02(b) of the Purchase Agreement, since its planned acquisitions of license rights exceeds five.

43. Harvest, at a minimum, has created a conflict with applicable legal requirements material to the Elevele/Harvest transaction embodied in the Purchase Agreement.

44. Harvest's failure to address and resolve the conflict between the number of dispensary licenses it purports to have the right to acquire and the legal requirements expressed in Section 1290.40(a)(14) of the Illinois Administrative Code was a condition

8

that existed through the Termination Date of June 23, 2019 and continues to exist to this date.

45. Harvest's failure to cure the breach of its representation and warranty as well as certain covenants has relieved Elevele from closing the Purchase Agreement. (**Ex. A**, § 5.02(a) at p. 35).

46. Hunt, as the Members' Representative, thus had the right under Section 5.03(c)(ii) of the Purchase Agreement to terminate it.

47. On June 27, 2019, Elevele and Hunt delivered written notice of termination of the Purchase Agreement to Harvest (the "Termination Notice"). (**Ex. B**).

48. In the Termination Notice, Elevele and Hunt (through counsel) informed Harvest that:

> …certain of the conditions set forth in Section 5.02 were not fulfilled by the Termination Date (as defined in the [Purchase] Agreement), as contemplated by Section 5.03(c)(ii) of the [Purchase] Agreement. With respect to Section 5.02(a), Harvest's execution of the [Purchase] Agreement, at a minimum, conflicted with Sections 1290.40(a)(14) of the Illinois Administrative Code and breached Harvest's representations in Section 4.02(b) of the [Purchase] agreement. That, coupled with Harvest's failure to address such conflict with the Illinois Department of Financial and Professional Regulation in a timely manner has led to the breach of certain of Harvest's covenants in Section 6.03, including to: (1) as "promptly as possible" use reasonable efforts to obtain all approvals from all Governmental Authorities (as defined in the [Purchase] Agreement) and (2) as "promptly as practicable" consummate the transaction, resulting in the conditions set forth in Section 5.02(b) not being fulfilled by the Termination Date.

(**Ex. B**).

49. Indeed, Harvest's apparent strategy of entering into contracts to acquire more licenses than it legally can hold is not unique to the State of Illinois.

50. In April 2019—just days after signing the Purchase Agreement here—Harvest received a notice from the Director of the Pennsylvania Department of Health. (**Ex. C**).

51. The April 10, 2019 letter from the Department of Health advised Harvest that it had engaged in a "blatant misrepresentation" regarding its status in Pennsylvania, specifically with respect to a release identifying how many licenses it held in the state. (**Ex. C**).

52. The specific press release from Harvest boasted that it owned "seven state licenses." (**Ex. C**). However, Pennsylvania law—just like Illinois law—allows a maximum of five permits for any one entity.

53. Upon information and belief, Harvest obtained the excess permits in Pennsylvania by applying through different corporate names, each identified on the April 10 letter from the Director of the Department of Health. (**Ex. C**).

54. Roughly a week after the Director of the Pennsylvania Department of Health contacted Harvest, it launched an investigation and issued a document demand to determine if Harvest misrepresented itself in seeking to win excess permits to grow and sell medical cannabis.

55. Aware of Harvest's regulatory problems elsewhere but nonetheless committed to working in good faith to close the Purchase Agreement, Elevele attempted to resolve with Harvest differences that imperiled the timely closing of the transaction.

56. Despite request from Elevele, Harvest did not submit to the IDFPR any plan to address comprehensively the more than five dispensary licenses Harvest has contracted to acquire in Illinois.

57. Nor, before or after the Termination Notice, did Harvest provide IDFPR any indication that it would consider the Elevele dispensary license a priority and not seek to dispose of, or otherwise divest itself of, the Elevele license.

58. Harvest, too, failed to provide any assurances to the IDFPR that it had relinquished or otherwise sought not to continue pursuing the acquisition of other dispensary licenses in the State of Illinois.

59. Therefore, Elevele and Hunt have received no assurances of whether the IDFPR will approve the Harvest/Elevele transaction.

60. Based on this set of circumstances, Elevele and Hunt reasonably concluded that Harvest had not moved as promptly as practicable to use reasonable efforts to consummate the Purchase Agreement and cure closing obstacles that Harvest itself created. (**Ex. A**, § 6.03(a) at p. 38).

61. To the same end, Elevele and Hunt reasonably concluded that Harvest still had not moved as promptly as possible to use reasonable efforts to obtain all consents, authorizations, orders and approvals from the IDFPR that would enable Elevele, Hunt, and Harvest to consummate the Purchase Agreement. (**Ex. A**, § 6.03(a)(ii) at p. 38).

62. Then on July 19, 2019, Elevele received a letter from the Assistant General Counsel at IDFPR, who advised Elevele that:

> This letter is to confirm the Illinois Department of Financial and Professional Regulation has not approved the Elevele and Harvest transaction at this time. The Department is still reviewing the submitted materials. The Department will not approve a transaction that gives a principal officer of a dispensary ownership, control or financial interest in more than 5 (five) dispensaries. Due to the implementation of the Cannabis Regulation and Tax Act and the numerous change of ownership requests sitting before the Department, review of pending requests is taking considerably more time than usual.

(**Ex. D**).

63. On the same day, counsel for Elevele and Hunt re-issued the Termination Notice to Harvest. (**Ex. E**).

64. Harvest then responded to the Termination Notice on July 23. (**Ex. F**).

65. According to Harvest: "The Termination Notice is invalid. Elevele has no basis to terminate the Agreement, and Elevele is not relieved of its obligation to close the contemplated [Purchase Agreement] as soon as possible." (**Ex. F**).

66. After stating why it disagreed with the Termination Notice's content, Harvest then stated: "Given your position, Harvest has no choice but to seek appropriate legal recourse in the courts, including injunctive relief under [Section] 8.16 [of the Purchase Agreement]." (**Ex. F**).

67. At all times, the Elevele and Hunt properly and validly issued the Termination Notice to Harvest.

68. Because Harvest incorrectly contends otherwise, this matter presents a ripe, actual, and justiciable controversy that merits a declaratory judgment in the Plaintiffs' favor.

69. The uncertainty over the Purchase Agreement, and Harvest's unreasonable contention that Elevele is not relieved of its obligation to close "as soon as possible," threatens to cause further economic injury to the Plaintiffs.

70. In June 2019, Gov. JB Pritzker signed into law the Cannabis Regulation and Tax Act (the "Recreational Cannabis Act"), which among other provisions will enable the recreational use of cannabis in the State of Illinois beginning January 1, 2020.

71. The Recreational Cannabis Act, and in particular Section 15-20, allows existing medical dispensary license owners—that is, a party like Elevele—to acquire a secondary site "within 60 days of the effective date" (or, March 1, 2020).

72. More specifically, the Recreational Cannabis Act allows a licensed dispensary to apply for what's termed an Early Approval Dispensing License "to operate a dispensing organization to serve purchasers at a secondary site not within 1,500 feet of another medical cannabis dispensing organization or adult use dispensing organization."

73. By creating a condition of uncertainty regarding the Purchase Agreement, Harvest has threatened the economic interest that Elevele retains under the Recreational Cannabis Act to acquire a secondary site and thus increase its goodwill and enterprise value.

74. Elevele is able to pursue a secondary site license and is committed to doing so if the Purchase Agreement has been validly and properly terminated. But if it has not been, Elevele cannot pursue or obtain a secondary site registration due to certain restrictions on Elevele contained in the Purchase Agreement. (**Ex. A**, § 6.04(e) at p. 40).

75. This uncertainty further shows why judicial intervention and a declaratory judgment are warranted.

### CLAIM FOR RELIEF – DECLARATORY JUDGMENT
### 28 U.S.C. § 2201

76. The Plaintiffs restate and re-allege paragraphs 1-75 as if fully set forth in this paragraph 76.

77. The Plaintiffs contend that they validly and properly terminated the Purchase Agreement on June 27, 2019 (as later confirmed on July 19, 2019) for the reasons set forth above.

78. Harvest has disputed the Plaintiffs' exercise of their termination rights and has declared the Plaintiffs' termination notice invalid.

79. Harvest thus contends that Elevele is obligated to close the transaction contemplated by the Purchase Agreement "as soon as possible." (**Ex. F**).

80. Harvest further has advised the Plaintiffs that it intends to seek "appropriate legal recourse in the courts, including injunctive relief." (**Ex. F**).

81. Based on these diverging views of the Termination Notice the Plaintiffs delivered, an actual case and controversy exists between the Plaintiffs and Harvest.

82. The parties have adverse legal interest of sufficient immediacy to warrant the issuance of a declaratory judgment concerning the validity of the Termination Notice the Plaintiffs delivered to Harvest.

83. A declaratory judgment will terminate the uncertainty regarding the transaction contemplated by the Purchase Agreement and will clarify any continuing obligations the parties may have under the Purchase Agreement.

84. In these circumstances, the Court may enter declaratory relief under 28 U.S.C. § 2201(a).

REQUEST FOR RELIEF

Accordingly, the Plaintiffs request that this Court enter judgment in its favor and award the following relief:

A. A judicial declaration that Elevele and Hunt validly terminated the Purchase Agreement;

B. A judicial declaration that Elevele and Hunt have no obligation to proceed to closing under the Purchase Agreement;

C. Their reasonable attorneys' fees and litigation expenses under Section 8.04 of the Purchase Agreement; and

D. An award of costs, as well as other relief the Court deems equitable.

***

Dated:  July 24, 2019

Respectfully submitted,

ELEVELE LLC and ANDREW HUNT

By:     */s/ Kenneth J. Vanko*
        Attorney for Plaintiffs

15

Kenneth J. Vanko  ARDC#6244048
Clingen Callow & McLean, LLC
2300 Cabot Drive, Suite 500
Lisle, Illinois 60532
(630) 871-2600
vanko@ccmlawyer.com